IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF FLORIDA

Case No.   0:21-cv-62295

TRADESPOT MARKETS INC.,

    Plaintiff,

v.

ICARO MEDIA GROUP INC.,

    Defendant.

## COMPLAINT

Plaintiff Tradespot Markets Inc. ("Plaintiff") sues defendant ICARO Media Group, Inc. ("Defendant"), and alleges the following:

## THE PARTIES

1. Plaintiff is a corporation organized and existing under the laws of the State of Florida with its principal place of business located in Broward County, Florida.

2. Defendant is a corporation organized and existing under the laws of the State of Nevada with its principal place of business located at 555 Madison Avenue, 26th Floor, New York, NY 10022.  Defendant's agent for service of process is: National Registered Agents, Inc., 701 S. Carson Street, Suite 200, Carson City, NV 89701.

## JURISDICTION AND VENUE

3. This Court has subject matter jurisdiction pursuant to 28 U.S.C. § 1332(a) because the matter in controversy exceeds $75,000.00, exclusive of interest and costs, and is between citizens of different states.

4. This Court has jurisdiction over Defendant as it breached a contract requiring

performance in this State and because such contract also contains a provision whereby Defendant "hereby irrevocably submits to the jurisdiction of any Florida State of Federal court sitting in Broward County Florida over any action or proceeding arising out of or relating to this Agreement…."

5. Venue properly lies in this district pursuant to 28 U.S.C. § 1391(b) because the causes of action asserted herein accrued in this district and because the contract at issue contains a venue provision consenting to venue in this district.

## BACKGROUND

6. Plaintiff is a broker-dealer incorporated in the State of Florida.

7. Defendant offers AI technology, real-time analytics, advertising, and e-commerce integrations products and services to media companies.

8. In October 2020, Plaintiff and Defendant executed an "Advisory/Investment Banking/Placement Agent Agreement" (the "Agreement") whereby Defendant retained Plaintiff to serve as its *exclusive* placement agent and investment banker. A true and correct copy of the Agreement is attached hereto as Exhibit "A."

9. Pursuant to the Agreement, Plaintiff was to serve as the exclusive agent and/or financial advisor for Defendant in obtaining financing in the form of a private placement and/or public offering and, among other activities, to assist Defendant in identifying potential acquirers.

10. The Agreement specifically identifies certain compensation owing from Defendant as consideration for the services to be provided by Plaintiff. Relevant hereto, such compensation includes:

(a) Upon the closing of first monies received by Defendant as part of the placement, Plaintiff shall be paid a non-refundable advisory/due-diligence fee of $25,000.00;

(b) Upon the completion of a minimum of $2.5 million of a placement, Defendant shall issue to Plaintiff warrants exercisable for a period of five years, exercisable at $1.20, to purchase 200,000 shares of Defendant's common stock;

(c) Defendant shall pay to Plaintiff a cash fee equal to eight percent (8%) of the total amount of equity capital raised and received by the Company during the term of the agreement from the sale of its securities. Also, Defendant shall deliver Private Placement Fee Warrants to Plantiff. As part of the Private Placement Financing Completion Fee, in addition to the eight per cent (8%) cash fee, remuneration noted above, Plaintiff is to receive warrants to purchase common stock of Defendant in an amount equal to eight percent (8%) of the number of shares of common stock (or common stock equivalents) purchased by investors in the Capital Raising Transaction and that the investors obtain a right to acquire through purchase, conversion, or exercise of convertible securities issued by Defendant in a Capital Raising Transaction that closed during the term of the Agreement. In the event there is no public market for Defendant's common stock and investors do not receive warrants in the Capital Raising Transaction, the exercise price of the warrants to be delivered to Plaintiff will be equal to 120% of the price per share that investors in the Capital Raising transaction are able to purchase securities from Defendant.

11.  Immediately upon executing the Agreement, Plaintiff endeavored to perform its contractual services as placement agent and/or financial advisor to any Capital Raising Transaction.

12.  From February 2021 to May 2021, Paul Feller (Defendant's Chairman and CEO) confirmed on multiple phone calls to Plaintiff's principal that sales totaling over $5,000,000.00 had occurred with respect to the aforementioned private placement.

13. Notwithstanding such sales/receipt of at least $5,000,000.00 by Defendant, none of the above-described monies have been paid to Plaintiff or warrants delivered, pursuant to the terms of the Agreement.

14. On July 8, 2021, Plaintiff notified Defendant in writing of its default under the Agreement and subsequently (on July 20, 2021) sent the same notice to Defendant's registered agent. To date, Plaintiff has received no response to its notice of default.

15. All conditions precedent to the filing of this action have been performed, occurred, or been waived.

## COUNT ONE:  BREACH OF CONTRACT

16. Plaintiff re-alleges and incorporates paragraphs 1 through 15 as set forth above.

17. The Agreement is a valid, enforceable contract under Florida law.

18. Plaintiff fully performed each of its obligations under the Agreement.

19. Defendant materially breached the terms of the Agreement by failing to pay: (a) advisory/due-diligence fee of $25,000.00 and (b) a cash fee equal to eight percent (8%) of the total amount of equity capital raised. Defendant further breached the terms of the Agreement by failing to issue and deliver to Plaintiff warrants exercisable for a period of five years, exercisable at $1.20, to purchase 200,000 shares of Defendant's common stock as well as the Private Placement Fee Warrants, as described above.

20. Assuming that the total amount of equity capital raised by Defendant was at least $5,000,000.00, this would result in (at minimum) a total of $425,000.00 owing from Defendant to Plaintiff in addition to the above-described warrants (with the amount owing increasing for every dollar of additional equity capital raised by Defendant).

21. Further, Plaintiff has incurred attorneys' fees, costs, and expenses resulting from

Defendant's breach of the Agreement for which Defendant is liable and required to pay Plaintiff pursuant to the terms of the Agreement, specifically Paragraph 8 of the Agreement.

**WHEREFORE**, Plaintiff demands judgment against Defendant for compensatory damages, specific performance (issuance and delivery of the warrants), prejudgment interest, post-judgment interest, reasonable attorneys' fees, costs, and such other relief as the Court deems just and proper.

Dated: November 5, 2021.

DESOUZA LAW, P.A.
3111 N. University Drive
Suite 301
Coral Springs, FL 33065
Telephone: (954) 603-1340
DDesouza@desouzalaw.com

By: /s/ Daniel DeSouza, Esq.
    Daniel DeSouza, Esq.
    Florida Bar No.: 19291

EXHIBIT "A"

# TRADESPOT MARKETS INC.

FINRA  
SIPC

TELEPHONE: (954) 916-3899  
MOBILE (954) 931-7275



September 24th, 2020

Paul Feller  
Chairman & Chief Executive Officer  
ICARO Media Group, Inc.  
555 Madison Avenue, 26th Flr  
New York, N.Y. 10022

## ADVISORY/INVESTMENT BANKING/PLACEMENT AGENT AGREEMENT

THIS ADVISORY/INVESTMENT BANKING/PLACEMENT AGENT AGREEMENT is made this 10th day of October 2020, by and between ICARO Media Group Inc. (hereinafter referred to as the "Company" or "ICARO"), and Tradespot Markets Inc. (hereinafter referred to as the "Tradespot "or "Advisor").

NOW, THEREFORE, in consideration of their mutual agreements and covenants contained herein, and for other valuable consideration, the receipt and sufficiency of which is hereby acknowledged, and in further consideration of the affixation by the parties of their respective signatures herein below, the parties agree as follows:

The purpose of this Agreement is to confirm the mutual understanding and agreement regarding the scope and terms of the retention of Tradespot ("Tradespot") as exclusive Placement Agent and Investment Banker to ICARO, its subsidiaries and affiliates.

The Company agrees that Tradespot shall be the sole party assisting the Company with respect to the placement. The Company represents that no person or entity is currently engaged as a finder, broker, or otherwise with respect to any equity or other securities of the Company (or in any manner engaged in any effort to raise equity or debt or sell any asset) or authorized to make any disclosures to potential investors in the Company beyond the Company's board of directors and executives itself.

1. Services

    a. Tradespot shall assist and represent the Company, in its efforts to obtain financing in the form of a private placement and /or public offering, whether in one or a series of transactions (a "Capital Raising Transaction"), in either public equity, convertible debt or equity, equity linked securities, debt securities, or any other securities ("Securities"). Tradespot will introduce the Company to potential investors who may have an interest in financing the Company and will advise the Company with respect to the proposed structure, terms and conditions of the financing. Tradespot will help the Company prepare for investor meetings, management presentations, responses to requests for data and other activities. Tradespot will assist the Company in managing the process of negotiating and closing the financing whether public or private. This includes reviewing all proposals from potential financing sources, analyzing the terms of such proposals and participating in presentations to the Company's Board of Directors regarding any proposals, as well as reviewing Company SEC filings, transaction documentation and other offering and closing activities. The Company is free, at its sole discretion, to accept or reject the terms of any proposed financing;

    b. Tradespot shall assist the Company in identifying potential acquirers (the "Acquirer"), via a SPAC vehicle or otherwise, and evaluating, prioritizing, negotiating proposals to sell the Company, in whole or parts by sale, merger, consolidation and other business combinations involving all or substantial amount of the business, securities, assets of the Company (a "Sale Transaction"), provided, however, that the definitions of a "Sale Transaction" and an "Acquisition Transaction" shall each exclude the issuance of new Securities, which issuance is considered a Capital Raising Transaction. Tradespot shall assist the Company if requested in writing, in the review and potential acquisition by the Company of various targeted companies to be identified (the "Targeted Companies") (in one or a series of transactions), by purchase, merger, consolidation and other business combination involving all or substantial amount of the business, securities, assets of the Targeted Companies (an "Acquisition Transaction");

2. Scope of the Agreement

   As the exclusive Placement Agent to the Company pursuant to this Agreement, Tradespot will provide the services necessary to assist the Company. These services may include:

   - Provide the Company management with recommendations regarding methods of addressing the Company's financing and public market needs;

   - Assist in the conduct of all necessary due diligence investigations of the Company;

   - Assist the Company in identifying and evaluating potential candidates as acquierers for acquisitions, joint ventures or other business relationships;

   - Introducing the Company to asset managers and other members of the financial community;

   - Meeting with management of the Company and the Board of Directors as reasonably requested; and

2

- Providing such additional financial advice and services as the Company may reasonably request.

3. Company's Duties and Commitments

a. The Company agrees to provide to Tradespot, among other things, all information requested or required by Tradespot, or a potential financing source, including, but not limited to, information concerning historical and projected financial results and possible and known litigations, environmental and other contingent liabilities of the Company. The Company also agrees to make available to Tradespot such representatives of the Company, including, among others, directors, officers, employees, outside counsel and independent certified public accountants, as Tradespot may reasonably request.

b. The Company shall promptly advise Tradespot of any material changes in its business, finances or shareholdings. The Company represents that all information made available to Tradespot by the Company, including, without limiting the generality of the foregoing, any descriptive memorandum or other information materials prepared by or approved by the Company, will be complete and correct in all material respects and will not contain any untrue statements of a material fact or omit to state a material fact necessary in order to make the statements therein not misleading in light of the circumstances under which such statements are made. In rendering its services hereunder, Tradespot will be using and relying primarily on such information without independent verification thereof or independent appraisal of any of the Company's assets. Tradespot does not assume responsibility for the accuracy or completeness of the information to which reference is made above.

c. The Company agrees to immediately advise Tradespot of any facts or circumstances, which could have a material effect, whether adverse or positive, on the Company's financial condition, business or prospects.

d. If required for financing, within thirty days subsequent to the execution of this Agreement the Company shall have retained Legal Counsel mutually acceptable to Tradespot (if Company's current Legal Counsel, Pyror Cashman, is no longer engaged), and the Company, to represent the Company for purposes of legal review of Private Offering documents and legal review and filing of the Company's SEC filings and amendments thereto.

4. Term and Termination

This Agreement shall have an initial term of twelve months (the "Term"), commencing upon the execution and delivery by the Company of the Agreement and the Due Diligence/Retainer Fee, (the "Effective Date") and continues thereafter; provided however, the Company may terminate the relationship at any time ninety (90) days after the Effective Date upon thirty (30) days written notice to Tradespot. Notwithstanding the termination or expiration of this Agreement, the Company shall remain liable to pay to Tradespot the amounts payable pursuant to the terms of this Agreement. This engagement is subject to the continuing approval of Tradespot's Compliance Department which may terminate the relationship at any time for cause to be defined as intentional fraud knowingly

3

misrepresenting material facts of the Company. Notwithstanding the foregoing, in the event of termination or expiration of this agreement, Tradespot's expenses incurred or fees due subject to Paragraph 5 or 8, below, will be payable in full and the Company's obligations under Paragraph 6 to pay any applicable Financing Completion Fee (including warrants) or M&A Completion Fee will continue for the twelve (12) month period commencing with such termination or expiration and the obligation shall survive any termination or expiration of this agreement (the "Tail Period" or "Breakaway Fee"). It is further understood that the Tail Period is applicable with respect to parties or entities introduced by or through Tradespot's efforts during the term of this agreement and any extensions, as well as other events more fully described in Paragraph 24, below. The provisions of this paragraph shall survive any termination or expiration of this agreement.

5. <u>Tradespot Retention and Compensation</u>

1) Upon the closing of first monies received to Company as part of this Placment, Tradespot shall be paid a non-refundable, Advisory/Due Diligence fee of $25,000 which shall serve as payment of an Advisory/Due Diligence fee as covered by this letter agreement and shall be deemed earned by Tradespot upon payment. In addition, upon the completion of a minimum of $2.5m of the $15m Placement, the Company shall issue to Tradespot warrants exercisable for a period of five years, exercisable at $1.20, to purchase 200,000 shares of the Company's common stock. These warrants are non-redeemable, non-callable, non-cancellable and will contain customary provisions including, but not limited to, a net exercise provision, and (assuming the Company has publically traded registered securities) provisions for one demand registration of the underlying shares of Common Stock at the Company's expense, an additional demand registration at the warrant holders' expense, and "piggyback" registration rights for a period of 5 years after issuance, a Tradespots expense. Such warrants shall be delivered to Tradespot, in denominations and names of its designated persons as instructed by Tradespot, within 10 calendar days from the completion of the first $2.5m portion of the $15m placement.

All amounts paid or due to Tradespot, and warrants issued or due to Tradespot, under this Paragraph 5, shall have no offsets, are non-refundable, non-cancelable, non-callable and shall be deemed earned upon payment or issuance and shall be free and clear of any of all encumbrances.

Tradespot will also be entitled to performance based fees as provided below:

6. <u>Fees</u>

Tradespot will receive performance-based compensation for its services as follows:

a. <u>Capital Raising - Private Placement.</u> In any Capital Raising Transaction, other than an underwritten public offering registered with the Securities and Exchange Commission, including private placements pursuant to exemptions from registration

4

requirements, private placements with or without resale registration rights and PIPES, Tradespot will receive the following:

    (i) *Financing Completion Fee.* Tradespot will be lead placement agent and/or financial advisor of any Capital Raising Transaction during the term of this agreement, and will be paid a cash fee (the "Private Placement Financing Completion Fee") equal to eight percent (8%) of the total amount of equity capital raised and three percent (3%) of the total amount of debt capital received by the Company during the term of this agreement (and the Tail Period) from the sale of its securities. The Private Placement Financing Completion Fee will be paid upon consummation of the Capital Raising Transaction(s) with respect to aggregate gross proceeds at the closing(s). With respect to any warrants issued to investors in connection with a Capital Raising Transaction, such Financing Completion Fee will be payable upon exercise of the investor warrants for net amounts of cash pai to the Company.

    (ii) *Warrants.* As part of the Private Placement Financing Completion Fee, in addition to the remuneration noted in Section 6(a) (i) above, Tradespot will receive warrants to purchase common stock in the Company in an amount equal to eight percent (8%) of the number of shares of common stock (or common stock equivalents) purchased by investors in a Capital Raising Transaction and that the investors obtain a right to acquire through purchase, conversion, or exercise of convertible securities issued by the Company in a Capital Raising Transaction that closes during the term of this agreement or during any Tail Period. In the event there is no public market for the Company's common stock and investors do not receive warrants in a Capital Raising Transaction, the exercise price of the warrants received by Tradespot will be equal to 120% of the price per share that investors in the Capital Raising transaction are able to purchase securities from the Company. The warrants shall be delivered at the closing(s) in holders names and denominations as instructed by Tradespot.

b. <u>Capital Raising - Underwritten Public Offering</u>. In any Capital Raising Transaction which involves an underwritten public offering registered with the Securities and Exchange Commission (a "Public Offering Capital Raising Transaction"), the following shall apply:

    (i) *Financing Completion Fee.* In any Capital Raising Transaction which involves an underwritten public offering registered with the Securities and Exchange Commission, where Tradespot is acting as an Independent Financial Advisor pursuant to FINRA Rule 5110(a), or in accord with its permitted business lines at the time, as an underwriter, the following shall apply: Tradespot and the Underwriting/Selling Group (together "Tradespot") will receive the following in total: a cash

5

fee equal to eight percent (8%) of the total amount of capital received by the Company during the term of this agreement and the Tail Period from the sale of its securities to investors, (the "Public Offering Financing Completion Fee" and collectively with the Private Placement Financing Completion Fee, a "Financing Completion Fee"). In addition, the Company shall pay Tradespot at the Closing a non-accountable expense allowance equal to one and one half percent (1.5%) of the gross proceeds received from the sale of the Securities (including Shares underlying an overallotment option, if and to the extent it is exercised). Such Public Offering Financing Completion Fee will be paid upon consummation of the Capital Raising Transaction with respect to aggregate gross proceeds.

(ii) *Warrants.* As part of the Public Offering Financing Completion Fee, Tradespot will receive warrants to purchase common stock of the Company. The number of shares will be determined as follows: (i) for an equity transaction, the number of warrant shares will be equal to eight percent (8%) of (a) the number of shares of common stock (or common stock equivalents) purchased by investors in a Capital Raising Transaction and (b) that the investors obtain a right to acquire through purchase, conversion, or exercise of convertible securities issued by the Company in a Capital Raising Transaction that closes during the term of this agreement (and thereafter as provided in Paragraphs 4 and 24 of this Agreement) and (ii) for a debt transaction, the number of warrant shares will be equal to three percent (3%) of (a) the number of shares of common stock determined by dividing the face amount of the debt by the closing market price, (or value of, in the case of no trading market) for the common stock on the day the Capital Raising Transaction closes during the term of this agreement (and thereafter as provided in Paragraphs 4 and 24 of this Agreement). The warrants will be exercisable at one hundred twenty percent (120%) of the price per share at which the investor can acquire the common stock in the Capital Raising Transaction, adjusted for conversion, stock splits or other dilutive events. In the event there is no public market for the Company's common stock and investors do not receive warrants in a Capital Raising Transaction, the exercise price of the warrants due to Tradespot will be equal to the price per share that investors in the Capital Raising transaction purchase or are able to purchase securities from the Company. The warrants will also include reasonable piggyback registration rights, a net exercise provision, be non-redeemable and will have a term of five years from the closing date of the Capital Raising Transaction. The warrants shall be delivered at the closing(s) in holder's names and denominations as instructed by Tradespot.

c. <u>Merger & Acquisition Advisory Services</u>.

(i) Tradespot will act as a financial advisor during the term of this agreement with respect to any Acquisition Transaction and any Sale/Merger Transaction via a SPAC vehicle or otherwise. If an Acquisition Transaction or Sale Transaction is consummated during the term of this agreement and the Tail Period, the Company will pay Tradespot a cash fee (the "M&A Completion Fee") equal to three percent (3%) of the Transaction Value (as defined in Appendix B), at the closing of the Acquisition or Sale Transaction;

(ii) If an Acquisition Transaction or Sale Transaction is consummated whereby, directly or indirectly, less than a fifty percent (50%) interest in the Company or the targeted companies, as the case may be, or any of their securities, businesses or assets are transferred for consideration, or if a transaction is consummated consisting of a minority investment, the formation of a joint venture, partnership or other business entity or entry into a strategic alliance (such as an agreement, relationship or arrangement involving supply, distribution or sales representation of products or services, research and development, technology, product licensing or similar arrangement), the Company will pay Tradespot a cash fee equal to three percent (3%) times the Transaction Value (as defined in Appendix B ), upon the occurrence of such event;

(iii) If an Acquisition Transaction or Sale Transaction is not consummated and the Company is entitled to receive a "termination fee," "break-up fee," "topping fee," or other form of compensation payable in cash or other assets, including, but not limited to, an option to purchase securities from another company (such cash, securities, including in the case of options, the right to exercise such options or other assets hereinafter referred to as the "Break-up Fee") then the Company shall pay to Tradespot in cash, immediately upon the Company's receipt of such Break-up Fee, an amount equal to thirty percent (30%) of such Break-up Fee received. In the event that the Break-up Fee is paid to the Company in whole or in part in the form of securities or other assets, the value of such securities or other assets, for purposes of calculating our fee, shall be the fair market value thereof, as the parties hereto shall mutually agree on the day such Break-up Fee is paid to the Company; provided that, if such Break-up Fee includes securities with an existing public trading market, the value thereof shall be determined by the last sales price for such securities on the last trading day thereof prior to such payment. The securities or other assets shall be delivered to Tradespot immediately upon receipt by the Company.

d. <u>Future Capital Raising</u>

Upon the closing of a private or public capital raising transaction or an M&A transaction as contemplated by this agreement, the Company agrees that Tradespot shall have the right to be the Company's

7

Participating Banker as defined below for the next twenty four (24) months from closing with respect to all future financings involving the private or public sale of securities by the Company or the sale of securities convertible into stock of the Company ("Future Company Financings") pursuant to the terms set forth herein. "Participating Banker" shall mean the right, but not the obligation, of Tradespot to participate as Banker/Financial Advisor for up to one-third of the participation and the economics as a Co-Manager/Underwriter in Public (Registered) Securities Offerings and for up to one-half of the participation and economics in Private Securities Offerings. Notwithstanding anything to the contrary contained in the prior sentence, the use of the term "economics" shall mean that Tradespot shall be entitled to receive the same economic benefits as other Co-Managers for any participation and funds raised by Tradespot in any such Future Company Financings and Private Securities Offerings;

7. Authorization

The Company designates and empowers Tradespot to act as its representative for the purposes of performing Tradespot's services described in Section 1 above. For purposes of this Agreement, references to the Company shall also include any subsidiaries or affiliates of the Company, their officers, directors, employees, agents, etc.

8. Expense Reimbursement

The Company agrees to reimburse Tradespot for all reasonable and customary out-of-pocket expenses, including travel and lodging expenses related to the Agreement. Any individual expense item shall not exceed $1000 without the prior written consent of the Company. The Company agrees to reimburse or pre-pay all necessary, reasonable legal expenses incurred, or to be incurred, by Tradespot for services provided by its legal counsel regarding an Offering. In addition, the Company agrees to pay for any and all costs, fees, and expenses incurred by Tradespot in collecting the compensation under this Agreement, including but not limited to legal fees, collection fees, and filing fees. Expense reimbursement shall be paid by the Company to Tradespot within 30 days of presentment of invoices.

9. Representations and Warranties

The Company hereby represents, warrants and covenants that the information supplied or to be supplied to Tradespot, whether written or oral, is true and correct in all material aspects, that all material facts necessary in light of the circumstances, have been or will be disclosed in order that such information is not misleading. The Company acknowledges its duty to update any information previously supplied and to keep Tradespot fully informed of all material Company plans, transactions and developments to render such information not misleading.

10. Role of Tradespot

8

Notwithstanding any provision herein to the contrary, it is understood that the Tradespot shall function on behalf of the Company, solely as a financial Advisor. Tradespot is not acting as an attorney or certified public accountant or investor relations or public relations entity regarding any advice it provides, and the Company is expected to seek competent advice from duly licensed practitioners acceptable to Tradespot such as it deems appropriate. Although Tradespot does not engage in the practice of investor relations or public relations, at Company's request Tradespot will act as the Company's agent in that Tradespot will interface with the Company's investor and public relations firms with regard to communications and presenting the Company to the investment and other communities, and although Tradespot does not engage in the practice of law or public accounting and auditing, Tradespot will provide advice to the Company with respect to its proposed Audits and compliance and filings with the Securities and Exchange Commission, trading platforms, and other matters; as requested.

The Company acknowledges and agrees Tradespot is not and shall not be construed as a fiduciary of the Company or its shareholders and Tradespot shall have no duties or liabilities to the equity holders or creditors of the Company or any other person by virtue of this Agreement or the retention of Tradespot hereunder; and Tradespot shall not be obligated to prepare any written reports, documents or responses.

The Company understands that if Tradespot is asked to act for the Company in any other capacity relating to this engagement but not specifically addressed in this letter, then such activities shall constitute separate engagements and the terms and conditions of any such additional engagements will be embodied in one or more separate written agreements containing provisions and terms to be mutually agreed upon. The indemnity provisions in Appendix A shall apply to any such additional engagements, unless superseded by an indemnity provision set forth in a separate agreement applicable to any such additional engagements, and shall remain in full force and effect regardless of any completion, modification or termination of any additional engagement(s).

The Company hereby acknowledges that Tradespot and its affiliates are in the business of providing financial services and consulting advice to others. Nothing in this Agreement shall be construed to limit or restrict Tradespot in rendering such advice and services to others, except as such advice service may relate to the Company's business and properties or matters that might compromise confidential information delivered by the Company to Tradespot

Except as otherwise provided in this paragraph, any written or other advice rendered by Tradespot pursuant to its engagement hereunder is solely for the use and benefit of the Board of Directors of the Company and shall not be publicly disclosed in whole or in part, in any manner or summarized, excerpted from or otherwise publicly referred to or made available to third parties, other than representatives and agents of the Board of Directors, without Tradespot's prior written approval, unless such disclosure is required by law. In addition, Tradespot's services as an advisor to the Company may not be otherwise publicly referred to without Tradespot's prior written consent.

Tradespot is and at all times during the term of this Agreement will remain an independent contractor, and nothing contained in this Agreement shall be construed to create the relationship of employer and employee or principal and agent between the Company and Tradespot or any of Tradespot's employees or affiliates. Without limiting the generality of the foregoing, all final decisions with respect to matters about which Tradespot has provided advice or services hereunder shall be solely those of the Company, and Tradespot shall have no liability relating thereto or arising therefrom. Tradespot shall have no authority to bind or act for the Company in any respect. It is understood that Tradespot's

responsibility to the Company is solely contractual in nature and that Tradespot does not owe the Company, or any other party, any fiduciary duty arising from, or in connection with, this Agreement.

11.   Conflicts and other Advisory Activities

Tradespot may have other Clients in the same or similar business sectors as the Company. Tradespot (and its affiliates together) is a full service securities firm engaged in securities trading and brokerage activities as well as investment banking and financial advisory services. In the ordinary course of our trading and brokerage activities, Tradespot or its affiliates may hold positions, for its own account or the accounts of customers, in equity, debt or other securities of the Company or any other company that may be involved in a Sale Transaction or Acquisition Transaction. Nothing in this agreement shall be construed to limit the ability of Tradespot or its affiliates to pursue, investigate, analyze, invest in, or engage in investment banking, financial advisory or any other business relationship with entities other than the Company, notwithstanding that such entities may be engaged in a business which is similar to or competitive with the business of the Company, and notwithstanding that such entities may have actual or potential operations, products, services, plans, ideas, customers or suppliers similar or identical to the Company's or may have been identified by the Company as potential merger or acquisition targets or potential candidates for some other business combination, cooperation or relationship. The Company expressly acknowledges and agrees that it does not claim any proprietary interest in the identity of any other entity in its industry or otherwise, and that the identity of any such entity is not confidential information.

12.   Notices

All notices, demands or other written communications hereunder shall be in writing, and unless otherwise provided, shall be deemed to have been duly given on the third business day after mailing by United States registered or certified mail, return receipt requested, postage prepaid, Federal Express or other recognized overnight courier, or by electronic means addressed as follows:

**TO ADVISOR:**          Tradespot Markets Inc.
                         Attention: Mark Beloyan President
                         5400 South University Drive, Suite 206A
                         Davie, Fl 33328
                         mbeloyan@tradespotmarkets.com
                         954-916-3899


**TO THE COMPANY:**      Paul Feller
                         Chairman & Chief Executive Officer
                         ICARO Media Group, Inc.
                         555 Madison Avenue, 26th Flr
                         New York, N.Y. 10022
                         Paul.Feller@ICAROMediaGroup.com
                         347.620.9272

In each case, with copies to such other address or to such other persons as any Party shall designate to the others for such purposes in the manner herein above set forth.

10

13. <u>Amendments</u>

No modification, waiver, amendment or change of this Agreement shall be valid unless the same is in writing and signed by the parties.

14. <u>Merger</u>

This instrument, together with any other instruments referred to herein, contains all of the understandings and agreements of the Parties with respect to the subject matter discussed herein. All prior agreements whether written or oral are merged herein and shall be of no force or effect.

15. <u>Survival</u>

All of the representations and warranties of the Company contained herein shall survive the termination of this Agreement until the date upon which the liability to which any claim relating to any such representation or warranty is barred by all applicable statutes of limitations. The Company's obligations under Paragraphs 4, 5, 6, 8, 15, 16, 17, 18, 23, 24, and 26 and Appendix "A" and "B", attached hereto, shall survive the termination, expiration or supersession of this Agreement. The parties agree that their respective rights, obligations and duties that by their nature extend beyond the termination or expiration of this Agreement shall survive any termination or expiration and remain in effect thereafter.

16. <u>Severability</u>

If any provision or any portion of any provision of this Agreement, other than a condition precedent, if any, or the application of such provision or any portion thereof to any person or circumstance shall be held invalid and unenforceable, the remaining portions of such provision and the remaining portions of this Agreement or the application of such provision or portion of such provision as is held invalid and unenforceable to persons and circumstances other than those to which it is held invalid or unenforceable, shall not be affected thereby.

17. <u>Governing Law, Venue and Dispute</u>

   a) The Company and Tradespot each hereby irrevocably submits to the jurisdiction of any Florida State or Federal court sitting in Broward County Florida over any action or proceeding arising out of or relating to this Agreement and the Company and Tradespot each hereby irrevocably agrees that all claims in respect of such action or proceeding may be heard and determined in such New York State or Federal court. The Company and Tradespot each hereby irrevocably waives, to the fullest extent it may effectively do so, the defense of an inconvenient forum to the maintenance of such action or proceeding. The Company and Tradespot each agrees that a final judgment in any such action or proceeding shall be conclusive and may be enforced in other jurisdictions by suit on the judgment or in any other manner provided by law.

   b) The predominantly prevailing party in any legal proceeding shall be entitled to reimbursement for all legal expenses in connection therewith, including its attorney fees.

This Paragraph 17 survives termination or expiration of this Agreement

11

18. <u>Benefit of Agreement</u>

The terms and provisions of this Agreement shall be binding upon and inure to the benefit of the Parties, jointly and severally, their successors, assigns, personal representatives, estate, heirs and legatees.

19. <u>Captions</u>

The captions in this Agreement are for convenience and reference only and in no way define, describe, extend or limit the scope of the Agreement or the intent of any provisions hereof

20. <u>Further Assurances</u>

The Parties hereby agree to do, execute, acknowledge, and deliver, or cause to be done, executed, acknowledged or delivered and to perform all such acts and to deliver all such deeds, assignments, transfers, conveyances, power of attorney, assurances, stock certificates and other documents, as may, from time to time, be required herein to effect the intent and purpose of this Agreement.

21. <u>Status</u>

Nothing in this Agreement shall be construed or shall constitute a partnership, joint venture, employer-employee relationship but, rather, the relationship established pursuant hereto is that of principal and independent contractor-agent. Nothing in this Agreement requires the Company to enter into a merger, purchase, sale or financing transaction.

22. <u>Counterparts</u>

This Agreement may be executed in any number of counterparts by original or facsimile or electronic signature. All executed counterparts shall constitute one Agreement notwithstanding that all signatories are not signatories to the original or the same counterpart.

23. <u>Confidentiality</u>

Except to the extent necessary to perform its obligations hereunder or to comply with any applicable law, regulation, or rule, neither party shall disclose or divulge to any third party, other than its directors, officers, shareholders, auditors, or legal advisors, either before or after the termination of this Agreement, this Agreement or any document or information exchanged between the parties during the term of this Agreement, without the prior written consent of the other party, which consent shall not be unreasonably withheld.

24. <u>Post Expiration/Termination Services-- Tail Fees/Breakaway Fees</u>

The Company agrees that, if it shall pursue any investment banking/corporate finance transaction, during the period of 12 months from the expiration or termination of this

12

Agreement, it will retain Tradespot as its financial advisor/investment banker with respect to such transaction. Tradespot shall not be obligated to act as financial advisor/investment banker with respect to such transaction, but if it elects to do so, the Company shall compensate Tradespot under terms that are typical and customary and mutually agreed to for such transaction. If the Company does not wish to retain Tradespot's services as advisor for such Transaction, the Company shall pay Tradespot a fee equal to three percent (3%) of the legal consideration upon closing of such Transaction as a breakaway fee. If during the period of time of twelve months after expiration or termination of this Agreement, a merger, acquisition, joint venture, strategic alliances, debt financing, licensing or marketing arrangement or other business transaction, (other than in the normal course of business), or sale opportunity ("Transaction") for the Company arise with the Company being either the target or the surviving entity, Amiral as the Company's Financial Tradespot shall be retained to advise the Company. Fees to Tradespot shall be three percent (3%) of the "Legal Consideration" (as defined in Exhibit A) paid. All amounts payable pursuant to this paragraph 24 hereof are due and payable to Tradespot, in cash or by certified check if the consideration is cash, or properly executed certificates or other writings evidencing beneficial ownership of Tradespot if the consideration is other than cash, at the closing or closings of any Transaction. If the Company does not wish to retain Tradespot's services as advisor for such Transaction, the Company shall pay Tradespot a fee equal to one and a half percent (1.5%) of the legal consideration upon closing of such Transaction as a breakaway fee. If the Company had any discussions or communications with third parties or entities relating to a potential Transaction and such discussions or communications occurred prior to the expiration or termination of this Agreement, then for a period of 12 months after expiration or termination, Tradespot shall be entitled compensation enumerated in Section 6, above as a "tail fee"; if the Company does not wish to retain Tradespot's services as advisor for such Transaction, the Company shall pay Tradespot a fee equal to one half (50%) of the legal consideration enumerated in Section 6, upon closing of such Transaction, as a breakaway fee to be paid at the closing of the Transaction. This Paragraph 24 survives termination or expiration of this Agreement

25. <u>Authorization of Execution</u>

The undersigned represent that he is duly authorized to execute this Agreement on behalf of their respective Companies. It is agreed that an executed facsimile, electronic copy, or copy of this document is a legal and binding contract with the same force as the original.

26. <u>Indemnity and Contribution.</u>

The parties agree to the terms the indemnification agreement attached hereto as Appendix A and incorporated herein by reference. The provisions of this paragraph and Appendix A shall survive any termination or expiration of this agreement.

If you are in agreement with the foregoing, please execute and return a copy of this engagement letter, on or before October 6th, 2020 to the undersigned along with your check or wire transfer in the amount of $25,000 in favor of Tradespot Markets, Inc. representing the Initial Retainer Fee.

IN WITNESS WHEREOF, this Agreement has been executed by the parties hereto on the date set forth below.

| On behalf of the Tradespot, | On behalf of the Company, |
|---|---|
| Tradespot Markets Inc. | ICARO Media Group, Inc. |

By: *[signature]* Date 10/27/2020        By: *Paul H Feller* Date October 20, 2020
Name: Mark Beloyan                                    Name: Paul Feller
Title:  President, Tradespot Markets Inc.             Title:  Chairman & Chief Executive Officer

14